IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 7, 2019

## STATE OF TENNESSEE v. WILLIAM K. LAWRENCE, JR.

**Appeal from the Criminal Court for Davidson County**
No. 2015-D-2716    Cheryl A. Blackburn, Judge

_____

### No. M2018-01308-CCA-R3-CD

_____

Defendant, William K. Lawrence, Jr., was convicted of first-degree murder during the attempt to perpetrate a robbery. The trial court imposed a sentence of life imprisonment. In this appeal as of right, Defendant contends: 1) that the evidence is insufficient to sustain his conviction; 2) that the trial court erred by excluding the testimony of Timothy Harlan; and 3) that the trial court erred by failing to instruct the jury on all lesser-included offenses. Having reviewed the entire record and the briefs of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JR., JJ., joined.

Martesha L. Johnson, District Public Defender, and Jeffrey A. DeVasher, Assistant Public Defender, Nashville, Tennessee (on appeal) and Kristin Neff and Julie Bigsby, Assistant Public Defenders, Nashville, Tennessee (at trial) for the appellant, William K. Lawrence, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; Doug Thurman and Byron Pugh, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

**Background**

### State's Proof

On September 20, 2015, Bre'L Dozier attended the African Street Festival at Hadley Park in Nashville located near Tennessee State University (TSU) at 28th and 29th Avenues. Ms. Dozier and the victim, Eric Jackson, who was her longtime friend, planned to meet at the festival so they could talk, and he wanted to show her his new red Ford Mustang convertible. Ms. Dozier spoke with the victim by phone, and he told her where he was parked. They met at approximately 7:50 p.m. The victim's car was parked in a grassy area behind the library and the Samaritan Building, both of which face 28th Avenue. The victim's car faced 29th Avenue, which Ms. Dozier stated resembled more of an alley. The victim and Ms. Dozier spoke outside of the car, and the two then got inside the vehicle. The victim sat in the driver's seat, and Ms. Dozier sat in the passenger seat. The convertible top of the vehicle was closed at the time.

Ms. Dozier testified that while seated inside the victim's car, she saw two men walk past the vehicle from the direction of Hadley Park toward a nearby Wendy's Restaurant. Ms. Dozier testified: "And once they noticed there was a car to the right they took about four steps back, and they glanced at it for a moment. And then they proceeded to walk forward." Ms. Dozier testified that one of the men was wearing a white shirt, white hat, and an open vest. The other man was wearing a camouflage bandana around his neck.

Approximately ten minutes later, the same two men approached the victim's car. One of the men walked up to the driver's side of the vehicle with a gun and told the victim to get out and that he was "not playing." Ms. Dozier testified that there was a camouflage bandana covering the man's mouth, and he had a deep voice. His hair was cut short and "looked like a fade possibly on top." Ms. Dozier testified that the second man was standing at the passenger's side of the car with a gun. She said that the man was wearing a white shirt and dark pants, but she could not see his face because he was positioned toward the back passenger side of the vehicle. Ms. Dozier testified that both men were young African-Americans with slender builds. The two men appeared to be wearing the same clothing as the men she observed walk by the vehicle a few minutes earlier. Ms. Dozier testified that there was no indication that the victim knew the two men, and she did not know them. She said that the victim did not speak to the two men or make any gestures toward them. Ms. Dozier testified that the victim put his keys in the ignition and started the car, and she heard gunshots as it rolled forward. She further testified: "The car, shortly after it accelerated, it hit a pole that was a little further in front of us. And I yelled [the victim's] name. And when I looked to my left, he was facing me and he had been shot." Ms. Dozier described the shots as a single gunshot followed by

multiple gunshots a half-second later. She said that the multiple set of gunshots was in rapid succession. She screamed and slid down into the floorboard. She did not see where the two men went after the shooting. Multiple people came up to the car and got Ms. Dozier and the victim out of the vehicle. They also called for an ambulance. Ms. Dozier testified that the convertible top of the vehicle was open after the shooting. She spoke with police officers who arrived on the scene, and she later spoke with detectives. Ms. Dozier testified that she thought she saw someone on a bicycle wearing a black t-shirt after the shooting. She did not recognize the person on the bicycle as being involved in the shooting. She also denied telling police that one of the shooters wore a black shirt or a "beanie."

Ms. Dozier met with Detective Andrew Davis of the Metropolitan Nashville Police Department on October 6, 2015, and was shown a photographic lineup. She chose two individuals from the line up, number one and number five. Photograph number one was of Ne'Sean Montrell Brooks. Photograph number five in the lineup was of Co-defendant Tyjuan Wallace. At that time, Ms. Dozier was not certain which of the two individuals walked up to the victim's side of the car wearing a camouflage bandana.

Detective Davis also showed Ms. Dozier a video from the Marathon convenience store. Ms. Dozier was shown the video in court, and she identified two men as being the individuals "who walked through the alley and slightly turned around and noticed the vehicle." Ms. Dozier noted that the man with the camouflage bandana, whom she had previously identified as the person who approached the driver's side of the car, wore a white, green, and yellow polo shirt with the number "62" on it. The other man, whom she had previously identified as the person who approached the passenger's side of the car, wore a baseball cap and a colorful cardigan that was bright red, blue, and yellow. Ms. Dozier identified still photographs taken from the video, which also depicted the two men and the clothing that they were wearing. The photographs depicted other men that she did not see on the night of the shooting. Ms. Dozier was also shown surveillance video from Wendy's, and she identified the same two men as from the Marathon store video. Ms. Dozier identified Defendant and Co-defendant Wallace in the courtroom as being the two individuals who approached the victim's car. She identified Co-defendant Wallace as the person who approached the driver's side of the victim's car and Defendant as the person who approached the passenger side.

On cross-examination, Ms. Dozier agreed that before her in-court identification, she had never previously identified Defendant as the person who approached the passenger side of the victim's car. She denied initially telling police that she did not know if both men had guns. Ms. Dozier testified that she mentioned the gun in both her second and third statements to police. She agreed that she told Detective Davis that she focused on the man at the driver's side of the victim's car the most and that he had a "camo do-rag" over his mouth, squinty eyes, brown skin, and was very slender. Ms.

- 3 -

Dozier agreed that she also told Detective Davis that she did not get a good look at the person on the passenger's side of the car and that she only saw his shirt.

Ms. Dozier acknowledged that in the third interview with Detective Davis on October 6, 2015, she told him that she did not believe the man on the passenger's side fired any shots. Ms. Dozier agreed that she did not initially tell police about the pause in the shots because she was not asked about it. However, she told Detective Davis about it during the interview on October 6. She further agreed that she never told police that the man on the driver's side said, "I'm not playing." Ms. Dozier testified that she watched the surveillance videos from Wendy's and Marathon and that she and Detective Davis talked as they watched the videos. While watching the Wendy's video, Ms. Dozier pointed out a man on a bicycle, and the man wearing the white hat. While watching the Marathon video, Ms. Dozier told Detective Davis that she had seen the hat before and that one of the men who had been looking at the victim's car was wearing a hat. Ms. Dozier testified that she identified the individuals who walked up to the victim's car in both surveillance videos.

Ms. Dozier admitted that she initially told Detective Kulp at the scene that the man who approached the passenger side was wearing something red. She told Detective Davis that she did not get a good look at the man's face. Ms. Dozier testified that she spoke with Detective Davis a third time and told him that the man on the passenger side was wearing a white shirt and a red bandana near his midsection.

Jordan Sandifer testified that he and Defendant grew up together and attended school together. He said that they were best friends and that he saw Defendant every day in September of 2015. Mr. Sandifer was also childhood friends with Co-defendant Wallace. Mr. Sandifer testified that on September 20, 2015, he attended the African Street Festival with his friend "Monte," later identified as Montae Gray. He and Mr. Gray were both riding bicycles and arrived at the festival at approximately 5:00 p.m. Mr. Sandifer testified that he was with Defendant later that evening. Defendant was wearing a blue and white sweater, a white t-shirt, and a baseball hat. He also saw Co-defendant Wallace who was wearing a yellow and blue Polo shirt with a horse logo, and a camouflage bandana around his neck.

Mr. Sandifer testified that he, Mr. Gray, Defendant, and Co-defendant Wallace spent time together that evening at Hadley Park and in the surrounding area. At one point, they were at the Marathon Convenience store. They were also in the vicinity of Wendy's, the library, and the Samaritan Building. Mr. Sandifer testified that at some point he heard Co-defendant Wallace say, "I got to get back," which meant to rob someone for money. Co-defendant Wallace also used the term "jack," which meant the same thing. However, Mr. Sandifer said that he did not take Co-defendant Wallace seriously at the time. He did not believe Defendant was present when Co-defendant Wallace talked about robbery. Mr. Sandifer testified that approximately one hour before

the shooting, he saw Co-defendant Wallace pointing and "telling somebody about the red car that was sitting between - - sitting by the pole."  Mr. Sandifer saw the red Mustang parked between the library and the Samaritan Building.  He could not tell if anyone was inside the vehicle.  He never saw Defendant or Co-defendant Wallace walk by the vehicle before the shooting.

Mr. Sandifer testified that he knew that Co-defendant Wallace had a gun before the shooting because of the way that he was walking.  He also said that Co-defendant Wallace kept "pulling his pants up."  He could not tell if Defendant had a gun before the shooting, but he saw Defendant with one later that night.  Mr. Sandifer said that neither he nor Mr. Gray had a weapon.

Mr. Sandifer testified that he was later standing by a tree in front of the library and watched Co-defendant Wallace approach the red Mustang.  He said:

> [A]s soon as he went up on the car, I seen him grab on the car.  And then that's when [Defendant] came.  And then [Defendant] came, I heard the girl scream, and then I seen [Defendant] back up and he shot in the air. When [Defendant] shot in the air, he said, let's go.  So we took off running.  As we were running, we - - I just had to look back.  When I looked back, I just seen some more shots being fired.  After that, I  - - I ran across - - I was already across the street, but I hit another alley to get to the bridge.

Mr. Sandifer testified that Co-defendant Wallace approached the driver's side of the car, and his face was covered with the camouflage bandana.  He said that the car door did not open when Co-defendant Wallace grabbed the handle.  Mr. Sandifer testified that he saw both Defendant and Co-defendant Wallace with a gun. He said that Defendant was still wearing the clothes that he had on earlier in the evening, and he did not see Defendant with a bandana on his person. Mr. Sandifer testified that while riding away from the scene on his bicycle, he looked back and saw Co-defendant Wallace "fixing" his gun.  He then heard at least four or five gunshots.  Mr. Sandifer noted that Defendant had been riding Mr. Gray's bicycle before the shooting but must have "ditched it" because Defendant was on foot after the shooting. Co-defendant Wallace caught up to Mr. Sandifer and Defendant, and they crossed a pedestrian bridge.  Mr. Sandifer saw Diamond Armstrong and two other individuals at the foot of the bridge, and Ms. Armstrong called his name.  He did not stop to talk to her.  Mr. Sandifer then heard Defendant tell Co-defendant Wallace, "[Y]ou know I didn't do that." Co-defendant Wallace was on his cell phone and did not respond to the statement.  After crossing the bridge, Mr. Sandifer and Defendant went to a friend's house.  Mr. Sandifer did not know where Co-defendant Wallace went.

Mr. Sandifer testified that he was contacted by Detective Davis, and he and his mother met Detective Davis at the police station three or four days after the shooting. The interview lasted approximately two or three hours, and Mr. Sandifer did not tell Detective Davis the truth about what happened or that Defendant or Co-defendant Wallace were involved in the shooting. Mr. Sandifer testified that he was afraid to tell the truth, and he did not want to "give nobody up either." Mr. Sandifer met with Detective Davis again a few days later and gave Detective Davis his cell phone and the clothing that he was wearing on the night of the shooting. He also gave Detective Davis his fingerprints and a DNA sample. Mr. Sandifer testified that he again declined to tell Detective Davis the truth about the shooting because he "didn't want to give nobody up."

Mr. Sandifer and his attorney met with Detective Davis a third time on October 2, 2015. He signed a "use immunity agreement," which provided that any statements he made could not be used against him. He then told Detective Davis what he knew concerning the shooting. Detective Davis showed Mr. Sandifer a photographic lineup, and Mr. Sandifer identified Co-defendant Wallace. In the comments section of the lineup, Mr. Sandifer said: "He had a camo bandana and armed with a handgun. He ran up to the driver's side of the red Mustang." Mr. Sandifer also identified Defendant in another photographic lineup. In the comments section of the lineup, Mr. Sandifer said: "He was armed with a handgun and approached the passenger's side of the red Mustang." Mr. Sandifer identified a picture of the victim's car as the one that he saw on September 20, 2015, at the street festival, and he saw Defendant and Co-defendant Wallace approach the car with guns.

Mr. Sandifer identified Defendant, Co-defendant Wallace, and Mr. Gray on the video from the Marathon convenience store. There was a camouflage bandana around Co-defendant Wallace's neck in the video. Defendant was wearing a sweater and a baseball cap. Mr. Sandifer identified himself and Mr. Gray on bicycles. Mr. Sandifer testified that he, Defendant, Mr. Gray, and Co-defendant Wallace went to the Wendy's parking lot after leaving the Marathon store. He was shown the Wendy's surveillance video and identified himself, Mr. Gray, Co-defendant Wallace, and Defendant, who was riding a bicycle. Mr. Sandifer also was shown a series of still photos taken from the Wendy's video. One photo depicted Defendant riding a bicycle and wearing a white hat, one photo depicted Co-defendant Wallace, one photo depicted Mr. Sandifer riding a bicycle and wearing a black shirt, and another photo depicted Mr. Gray. Mr. Sandifer identified the point in the Wendy's surveillance video where Co-defendant Wallace and Defendant turned the corner in front of the Samaritan Building, and Mr. Sandifer believed they approached the victim's car at that time.

On cross-examination, Mr. Sandifer agreed that he did not call police after the shooting or stay around to help. He agreed that Diamond Armstrong called out his nickname, "Juice," when she saw him by the pedestrian bridge. Mr. Sandifer testified that Detective Davis' business card was left on his front door a few days later. His

mother then took him in for an interview with police on September 24, 2015, at the North Precinct. The interview was recorded and lasted for more than two hours and fifty minutes. Mr. Sandifer agreed that he gave police inconsistent versions of the events surrounding the shooting. He again gave inconsistent versions during a second interview on September 27, 2015. After the interview on September 27, Mr. Sandifer arrived home and found Detective Davis talking to Mr. Sandifer's father. He could not recall if he was supposed to call Detective Davis the following day. Mr. Sandifer testified that he called Ms. Armstrong and Denesha Hayden after the shooting because he was afraid that he would be charged with a crime. He met with an attorney on September 29, October 1, and October 2, 2015, and he had two attorneys present when he met with police on October 2 for a third interview. Mr. Sandifer signed a use immunity agreement, which had been explained to him in great detail. He was aware that he could still be charged in the case but that his statement could not be used against him. He also knew that he would not be arrested and would walk out of the police precinct after the interview.

Mr. Sandifer testified that he never had a gun during the time of the shooting, and he did not drop a gun as he picked up his bicycle to walk up the steps to the pedestrian bridge. He was aware that Co-defendant Wallace had a gun prior to the shooting, and he was with Co-defendant Wallace when he initially walked by the victim's car. Co-defendant Wallace then made comments about the vehicle, and he was aware of what Co-defendant Wallace wanted to do. Mr. Sandifer agreed that the video showed him following behind Mr. Wallace before the shooting. He thought that ten minutes passed from the first time that he and Co-defendant Wallace walked by the victim's car until the shooting occurred. Mr. Sandifer testified that he and Mr. Wallace walked by the car "a couple of times." He agreed that he watched Co-defendant Wallace put the bandana around his face. However, Mr. Sandifer testified that he did not have a bandana or a gun.

Mr. Sandifer testified that he did not take Co-defendant Wallace seriously when he said that he was going to "do something." Mr. Sandifer testified that he was dressed in black at the time of the shooting, and stood behind the victim's car under a tree.

On redirect examination, Mr. Sandifer testified that he did not know if Co-defendant Wallace walked by the victim's car with someone else because he was not with Co-defendant Wallace the entire time.

Officer Ronda Atwater of the Metropolitan Nashville Police Department testified that she was working off-duty security at the African Street Festival at Hadley Park on September 20, 2015. Shortly after 8:00 p.m., she and other officers were walking around the area when several individuals ran up and told them that they heard what was thought to be gunshots. The individuals pointed to an area where a group of people were yelling and screaming. Officer Atwater and two other officers approached the scene, and Officer Atwater noticed a red car. She pulled her flashlight out and looked into the car and saw Ms. Dozier and the victim in the car. Ms. Dozier was holding onto the victim, and she

- 7 -

was screaming and "very hysterical crying." Officer Atwater testified that the victim appeared to be deceased. She pulled Ms. Dozier out of the car and spoke with her briefly. She gave the information from Ms. Dozier to the patrol officers who arrived on the scene.

Detective Chad Gish of the Metropolitan Nashville Police Department Surveillance and Investigative Support Unit, testified as an expert in digital forensics. He extracted information from a seized Samsung Galaxy cell phone used by and associated with Co-defendant Wallace. Detective Gish used a "chip off procedure," a software that examines and organizes a digital copy of the phone's microchip, and found video and photographs on the phone that he identified as depicting Co-defendant Wallace and Wallace's girlfriend, Octavia Walker. Detective Gish also extracted an internet history from the phone. The history reflected Google searches for "shooting at Hadley Park, September 20," which was searched on September 21, 2015. Other searches were performed for "man shot in the head, killed library near TSU" and "[i]nvestigation continues into Hadley Park shooting death." Later in the day the same terms were used to update the internet search. At one point, someone using the phone clicked on a photograph of the victim. There were also several Google and Facebook searches made on September 22, 24, and 25, 2015, regarding the Hadley Park shooting. The cell phone was linked to an email account: tyjuanwallace@yahoo.com.

Detective Gish extracted text messages from the phone. A text message was sent at 9:29 p.m. on September 20, 2015 which read: "See what's going on for me at Hadley." A response was received three minutes later which read: "Gal got shot. In Da [sic] Head[.]" Another text was sent to the phone at 11:17 p.m. which read: "Delete them [sic] text messages I sent you too[.]" A text message was sent from the phone at 8:35 a.m. on November 3, 2015, which read: "Nall [sic] about that homicide I did at Hadley[.]" A text received in response at 8:41 p.m. read: "And what you say to them[?]" The next text was received at 8:51 p.m. and read: "Why and is the other boy in jail[?]" A text sent from the phone also at 8:51 p.m. read: "Nall [sic] everybody out[.]" A text received at 8:52 p.m. read: "So how they even know to come to you, somebody snitching[?]" A text sent at 8:56 p.m. read: "Right I had the mask on doe[sic][.]" Detective Gish testified that there was one message still on the cell phone that had not been deleted. It was sent at 8:43 on November 3, 2015, which read: "I didn't go[,] they talking about a search[.] I took my gun down [sic] doonk house[.]" It was Detective Gish's opinion that these text messages were exchanged between Co-defendant Wallace and his girlfriend Octavia Walker.

On cross-examination, Detective Gish agreed that he could not tell which person sent the text messages on the cell phone. He could only tell that they had been sent from the phone.

Sharon Tilley, a former crime scene investigator with the Metropolitan Nashville Police Department, testified that she processed the victim's car for evidence. There were bullet strike marks on the rear bumper and convertible top. There was also damage to the

front bumper and a crack in the windshield. Ms. Tilley photographed the vehicle and attempted to collect DNA evidence. She found one projectile that fell into the front passenger floorboard when she closed the glove box.

On cross-examination, Ms. Tilley agreed that the bullet defect in the convertible top of the victim's car was on the driver's side of the vehicle. She did not find any damage to the glove box or the area around it. Ms. Tilley agreed that bullet defects in the car were consistent with shots being fired from the driver's side of the vehicle.

Dr. Emily Dennison, a forensic pathologist at the Davidson County Medical Examiner's Office, testified that she performed an autopsy on the victim. She determined that the victim sustained a fatal perforating gunshot wound to the head. Dr. Dennison testified that there was an entrance wound was on the back, left-side of the victim's head and an exit wound was on the right side of the head near his ear. The path of the bullet was from left to right and back to front and slightly upward, which was consistent with the shooter standing to the left and slightly behind the victim. A small bullet fragment was recovered during the autopsy. Dr. Dennison testified that the victim's wound was fatal and that he would not have survived under any circumstances. It was her opinion that the victim was likely shot from a distance of more than three feet away. She further opined that the cause of the victim's death was a gunshot wound to the head, and the manner of death was homicide.

Detective Andrew Davis of the Metropolitan Nashville Police Department, the lead detective in the case, arrived at the scene of the shooting at approximately 9:00 p.m. on September 20, 2015. He spoke with Ms. Dozier and several people who had heard the gunshots. He also spoke with Detective Kulp, who had already arrived on scene. Ms. Dozier told him that one of the shooters wore a white hat. Detective Davis observed what appeared to be a bullet in the rear bumper and in the soft convertible top on the driver's side of the victim's car. No cartridge casings were found at the scene indicating that a revolver, which does not eject shell casings during firing, was used in the shooting.

Detective Davis eventually learned that Mr. Sandifer was believed to have been present when the victim was shot. Mr. Sandifer, at Detective Davis' request, met with Detective Davis on September 24, 2015, at the North Precinct. The interview lasted for approximately four hours and was recorded. Mr. Sandifer told Detective Davis that he went to the African Street Festival with his mother and later met Defendant and "Monte." He said that he also ran into a man named "Cookie," who was about "to run it hot." Mr. Sandifer told Detective Davis that "Cookie" ran toward the victim's car, and Mr. Sandifer then heard gunshots. Mr. Sandifer did not implicate anyone other than "Cookie" in the shooting. Detective Davis met with Mr. Sandifer again on September 27, 2015. His statement was similar to the one given on September 24. Mr. Sandifer provided a DNA sample, the clothing he wore on the night of the shooting, and his cell phone. A search warrant was obtained for Mr. Sandifer's cell phone, but no incriminating evidence was

found on it. Detective Davis testified that he informed Mr. Sandifer that he did not believe his story. Afterwards, Detective Davis drove to Mr. Sandifer's residence and spoke with Mr. Sandifer's father.

On September 28, 2015, Detective Davis obtained surveillance videos from Wendy's, the Marathon Convenience Store and other businesses in the area. The videos from Wendy's and the Marathon Store confirmed that Mr. Sandifer was with Defendant and Montae Gray on the night of the shooting. The videos also depicted Mr. Sandifer wearing clothing that was consistent with the clothing that he gave to police. Detective Davis also observed on the videos that both Defendant and Co-defendant Wallace were grabbing and protecting their waistbands. He said that Defendant was depicted wearing a cardigan and a white hat, and Co-defendant Wallace was wearing a camouflage bandana.

Detective Davis testified that he was later contacted by Mr. Sandifer's attorney, and a third interview was arranged for October 2, 2015. At the interview, Mr. Sandifer signed a use immunity agreement which provided that any statements he made during the interview could not be used against him unless he made contradictory statements under oath. Detective Davis pointed out that the agreement did not protect Mr. Sandifer from prosecution. During the interview, Mr. Sandifer identified Defendant and Co-defendant Wallace from photographic lineups. Mr. Sandifer said that Co-defendant Wallace approached the driver's side of the victim's car while armed with a handgun and wearing a camouflage bandana. Mr. Sandifer also said that Defendant approached the passenger side of the car while armed with a handgun. Detective Davis found Mr. Sandifer's statement at the third interview consistent with Ms. Dozier's account of the shooting.

Detective Davis also showed the photographic lineups to Ms. Dozier on October 6, 2015. She did not make a positive identification; however, she identified a photograph of Co-defendant Wallace as one of the two persons depicted in the lineup who could have approached the driver's side of the car. Detective Davis also showed Ms. Dozier the surveillance video from Wendy's. She identified individuals who looked like the two men she had seen walk in front of the victim's vehicle. Detective Davis also showed Ms. Dozier the Marathon surveillance video, and she pointed out Defendant and Co-defendant Wallace as the two individuals that she believed approached the victim's vehicle. She did not identify anyone else on the video as being involved in the shooting. Ms. Dozier specifically noticed the camouflage bandana that Co-defendant Wallace was wearing in the video and said it was the same as the one worn by the man who approached the driver's side of the vehicle. Detective Davis pointed out that at the scene, Ms. Dozier mentioned that one of the men wore a white hat. Defendant was depicted on the video wearing a white hat.

Detective Davis testified that at approximately 8:15 a.m. on November 3, 2015, he went to Co-defendant Wallace's residence. Co-defendant Wallace used a cell phone while Detective Davis was there. Detective Davis later obtained a search warrant for the

phone, which was registered to Co-defendant Wallace's mother. Detective Davis stayed at the residence for approximately twelve minutes and then left. The phone was turned over to Detective Gish for examination. Detective Davis reviewed the text messages extracted from the phone. He noted that a text message was sent from the phone at 8:29 while he was at Co-defendant Wallace's residence, which read: "[T]he detective just came to my house asking about that homicide." Detective Davis testified that the text messages on Co-defendant Wallace's cell phone were consistent with the information that Mr. Sandifer provided during his third interview with police.

A search warrant was also obtained and executed at Co-defendant Wallace's residence. Clothing was recovered that was consistent with the clothing worn by Co-defendant Wallace in the surveillance videos, including a camouflage bandana. Detective Davis testified that clothing was also obtained from Defendant, Mr. Sandifer, and Mr. Gray. However, Defendant did not provide the cardigan sweater that he was wearing on the surveillance videos. None of the clothing tested positive for gunshot residue which did not surprise Detective Davis given the passage of time from the day of the shooting. Detective Davis obtained DNA from Defendant, Co-defendant Wallace, and Mr. Gray. There was no DNA or fingerprint evidence that matched anything found on the victim's car. Detective Davis testified that he was not surprised that there was no match to anything because there were several people at the scene attempting to assist Ms. Dozier and the victim.

**Defense Proof**

Diamond Armstrong testified that she, Denesha Hayden, and "Kenny" were on the pedestrian bridge on the night of September 20, 2015, on their way to the African Street Festival. Ms. Armstrong exited the bridge and saw "Jordan [Sandifer] and [Defendant] and two other guys." She saw Mr. Sandifer drop a silver gun as he was running, and two of the men wore ski masks. She said that Detective Davis assumed that the weapon was a silver revolver. Ms. Armstrong testified that Mr. Sandifer was wearing a "flag" over his mouth. She called out Mr. Sandifer's nickname, "Juice," but he did not respond. Ms. Armstrong testified that Mr. Sandifer was on the side of the street when he dropped the gun, and she was on the other side of the street. She testified that she recognized Defendant on the bridge because he was not wearing a mask. Ms. Armstrong testified that one of the men was riding a bicycle.

Ms. Armstrong agreed that she was interviewed three times by police. She identified Defendant and Mr. Sandifer from photographic lineups. Ms. Armstrong and Ms. Hayden looked at the lineup on the same day but at different times, and Ms. Armstrong looked at the lineups before Ms. Hayden. Ms. Armstrong denied telling Ms. Hayden who to pick from the lineups. She did not dispute an earlier statement to Detective Davis that Mr. Sandifer was riding a bicycle. She also admitted that she did not remember everything that she had said earlier because it had been "a while back."

However, she insisted that "[e]verything that I do remember telling I'm telling you the truth right now." Ms. Armstrong testified that her recollection of what she observed on the pedestrian bridge was more accurate at trial than when she spoke with a detective on September 25, 2015. She was certain that she told the detective that two of the men were wearing ski masks, which was consistent with her trial testimony.

Ms. Armstrong denied that she talked to police because she wanted "to get justice for dude." She then clarified that detectives interviewed her twice, she reviewed her statements before trial, and she had cooperated with police in the case. Ms. Armstrong testified that she only saw one person with a gun and that it fell from Mr. Sandifer's hip as he picked up his bicycle to cross the bridge.

On cross-examination, Ms. Armstrong agreed that she first told police that she saw three men, including Mr. Sandifer and Defendant. She denied initially telling police that Defendant was hiding his face. Ms. Armstrong agreed that when police first asked if she saw a gun, she replied, "On they hip." She testified that she only saw one gun. She agreed that she initially said that Mr. Sandifer was on a bicycle, and Defendant and the other man were running. Ms. Armstrong testified that her trial testimony was more accurate than her statement to police. She said that when she viewed the photographic lineups, she told Detective Davis that Mr. Sandifer dropped a silver gun. She denied telling him that it was a revolver. Ms. Armstrong agreed that she initially told Detective Kulp that she was not paying attention to the type of gun she saw. She further agreed that she told an investigator that she "wanted to get justice for dude."

On redirect examination, Ms. Armstrong testified that she never told police that Defendant hid his face, and she told police that she saw Defendant's face. She reiterated that she saw only one gun and that it fell from Mr. Sandifer's hip. Ms. Armstrong agreed that she told police that the gun was "on [Mr. Sandifer's] hip, it fell, he's dumb as hell, trying to pick his bike up on the bridge."

**State's Rebuttal Proof**

Detective Nicholas Kulp of the Metropolitan Nashville Police Department testified that he interviewed Diamond Armstrong on September 26, 2015, on another matter when they began talking about the shooting near Hadley Park. He had reviewed the recording and transcript of the interview prior to trial. Ms. Armstrong told Detective Kulp the following concerning the shooting:

> [Mr. Sandifer] had a flag on his face with the bike, [Defendant] hid his face, the other dude had a mask. They got [sic] cameras up there, I don't know why they [sic] not doing they [sic] job, they [sic] worried about these little pictures.

- 12 -

Detective Kulp asked Ms. Armstrong whether the three men had guns, and she replied: "On they hip." The transcript of the interview reflects that Detective Kulp then asked: "So they had guns on their hips[?]" Ms. Armstrong replied: "On [Mr. Sandifer's], yeah, it fell, he dumb as hell, tried to pick it up – tried to pick up the bike." Ms. Armstrong said that Defendant and the "other dude" were running, and Mr. Sandifer was on the bicycle. She also said that she saw only three men, not four, and none of them were wearing a ski mask. On cross-examination, Detective Kulp agreed that Ms. Armstrong only identified Mr. Sandifer as a having a gun.

Denesha Hayden testified that she was with Ms. Armstrong on September 20, 2015. She observed three or four men running toward them from Hadley Park just as she and Ms. Armstrong stepped off the pedestrian bridge. Ms. Hayden recognized Mr. Sandifer as one of the men because they attended the same school. She said that Mr. Sandifer was riding a bicycle, and she did not see him in possession of a gun. Ms. Hayden talked to Detective Davis on September 29, 2015, and she was shown a photographic lineup. She circled Mr. Sandifer's photograph and wrote that Mr. Sandifer was one of three men "running to the bridge after [she and Ms. Armstrong] heard gunshots, one of the guys had a mask." Ms. Hayden identified Defendant in another photographic lineup as one of the three men that she saw on the bridge with Mr. Sandifer. She admitted that she told the prosecutor the day before her testimony that she chose Defendant out of the lineup because she was instructed to do so by Ms. Armstrong. When asked if she chose Defendant because she recognized him or because Ms. Armstrong told her to, Ms. Hayden testified that she chose Defendant's photograph because she knew him from school, and she had actually seen him on the bridge after she heard the gunshots. Ms. Hayden testified that Defendant was wearing a mask but she did not see a gun.

On cross-examination, Ms. Hayden agreed that she told Detective Davis that she saw one person who used a bandana to cover his mouth. She did not recall telling him what the other men were wearing. Ms. Hayden used her statement to refresh her recollection, and she testified that she told Detective Davis that Defendant was not wearing a mask. Ms. Hayden agreed that she did not know if anyone dropped anything on the night of the shooting.

On redirect examination, Ms. Hayden testified that she never told police that Mr. Sandifer was wearing a mask or that he had a gun.

Yosef Wise, an investigator for the Metropolitan Nashville Public Defender's office, testified that he was present when Ms. Armstrong was questioned by an investigator for Co-defendant Wallace. He heard Ms. Armstrong make the following statement to the effect of: "Here's the thing, I'm not speaking on that case no more because once I told them I was going to do that because I did that out of the kindness of my heart because I want justice for dude."

**Analysis**

*I.        Sufficiency of the Evidence*

Defendant argues that the evidence in this case was insufficient to support his conviction for first-degree felony murder.  He challenges the sufficiency of the evidence on three grounds:  1) that the State did not prove his identity as the perpetrator of the murder beyond a reasonable doubt; 2) that the State did not prove that he was criminally responsible for the conduct of Co-defendant Wallace; and 3) the conviction was based on the uncorroborated testimony of accomplice Jordan Sandifer.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)).  "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2). The culpable mental state required for a felony murder conviction is the intent to commit the underlying felony, namely robbery. T.C.A. § 39-13-202(b); see *Wagner*, 382 S.W.3d at 299. Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*. § 39-13-401(a). Someone commits theft if with the intent to deprive the owner of property, "the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id*. §39-14-103(a).

The "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim," even if the actual killing occurs prior to the commission of the felony. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). "Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances." *Id.* "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." *Id.* at 108.

First, Defendant argues that the State failed to "establish his identity as a perpetrator of the murder beyond a reasonable doubt." He asserts that the in-court identification by Ms. Dozier was flawed because "she repeatedly acknowledged that she never saw the face of the man who approached the passenger side door, never described any other characteristics about his physical appearance that would support her in-court identification, and never identified him during any out-of-court identification procedure." "The identity of the perpetrator is an essential element of any crime." *State v Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving beyond a reasonable doubt the identity of the defendant as a perpetrator. *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by either direct evidence or circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at 793; *see also State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as a perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005) (citing *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

The proof was sufficient to establish Defendant's identity. Ms. Dozier identified Defendant at trial as the man who pointed a gun at her while she was seated in the victim's car. Although Ms. Dozier testified that she never saw the face of the gunman who approached the passenger's side of the car, she consistently told police and testified at trial that the person was wearing a white shirt, dark pants, a multi-colored cardigan, and a white hat. She also described the two men who approached the car as young African-American men with slender builds. Ms. Dozier identified Defendant in the

- 15 -

surveillance videos from Wendy's and the Marathon store depicting Defendant, Co-defendant Wallace, and others at the two businesses shortly before the shooting. Defendant was the only person in the videos wearing those items of clothing described by Ms. Dozier. Ms. Dozier also identified Defendant as the same person that she observed in the alley with Co-defendant Wallace prior to the shooting. She described the man in the alley as wearing a white shirt, white hat, and an open vest. Ms. Dozier testified that the two men in the alley were wearing the same clothing when they approached the car before the shooting. She denied that the gunman on the passenger side of the car was wearing a black shirt like Mr. Sandifer was depicted wearing in the surveillance videos on the night of the shooting. Ms. Dozier was never hesitant in her identification of Defendant as the individual who approached the passenger side of the victim's car. The proof was sufficient to establish Defendant's identity as one of the perpetrators in this case. *See Smith v. State*, 573 S.W.2d 759, 761 (Tenn. Crim. App. 1978)("[T]he clothing description given by the victim and relayed by the police dispatcher to the officers tallied identically with the clothing worn by the appellant when he was apprehended and returned to the scene of the robbery[.]"). In addition, Mr. Sandifer's testimony established that Defendant was the man who went to the vehicle's passenger window during the incident leading to the victim's death.

Next, Defendant argues that the State did not establish beyond a reasonable doubt that Defendant was criminally responsible for the conduct of Co-defendant Wallace. He asserts that there was no proof that he shot the victim, and there was no evidence that he planned, directed, encouraged, or was aware of the shooting or attempted robbery of the victim. Defendant further argues that "[t]here is no evidence that [Defendant] associated himself with [C]o-defendant Wallace's venture, acted with knowledge that Wallace would shoot the victim and attempt to rob him, or shared Wallace's intent. No evidence was presented that [Defendant] knowingly, voluntarily, and with common intent united with Wallace in the commission of the crimes."

Criminal responsibility is not a separate offense but "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . based upon the conduct of another person." *State v. Lemacks,* 996 S.W.2d 166, 170 (Tenn. 1999). A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2010). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757

(Tenn. Crim. App. 1994)); *see State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

In this case, the proof established more than a mere presence by Defendant. Mr. Sandifer testified that Co-defendant Wallace had expressed his intent to rob someone. Co-defendant Wallace also pointed out the victim's red Mustang convertible. Although there was testimony that Co-defendant Wallace and Mr. Sandifer walked by the victim's car before the shooting, Ms. Dozier testified that she saw Co-defendant Wallace and Defendant walk by the car as well, and "once they noticed there was a car to the right they took about four steps back, and they glanced at it for a moment. And then they proceeded to walk forward." Mr. Sandifer acknowledged at trial that he walked by the car with Co-defendant Wallace. However, he also testified that he did not know if Co-defendant Wallace walked by the victim's car with someone else because he was not with Co-defendant Wallace the entire time. At trial, Mr. Sandifer identified the point in the Wendy's surveillance video where Co-defendant Wallace and Defendant turned the corner in front of the Samaritan Building, and he believed approached the victim's car.

Defendant shared in Co-defendant Wallace's intent to rob the victim by approaching the passenger side of the victim's car and pointing his gun at Ms. Dozier while Co-defendant Wallace approached the victim's side of the car and pointed a gun at him and grabbed the door handle of the car. This assured that neither the victim nor Ms. Dozier could escape from the car. The proof shows that both Defendant and Co-defendant Wallace fired shots when the victim attempted to drive away. Ms. Dozier described the shots as a single gunshot followed by multiple gunshots a half-second later. From these facts, the jury could reasonably find that the Defendant was guilty of felony murder under a theory of criminal responsibility. Although Co-defendant Wallace shot the victim, the proof established that Defendant was an "active participant in the events resulting in the victim's death and not merely present before and after the offense." *See State v. Antonio M. Crockett*, No. M2015-00566-CCA-R3-CD, 2016 WL 769890, at *13 (Tenn. Crim. App. Feb. 29, 2016).

Finally, Defendant argues that his conviction was based upon the uncorroborated testimony of accomplice Jordan Sandifer. In this case, the trial court instructed the jury that Jordan Sandifer was an accomplice as a matter of law and that his testimony alone could not be used to convict Defendant. The trial court further instructed the jury that Mr. Sandifer's testimony had to be supported by other evidence. See T.P.I. - Crim. 42.09 (a)(20th Ed. 2016).

When the only proof of a crime is the uncorroborated testimony of one or more accomplices, then the evidence is insufficient to sustain a conviction as a matter of law. *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little*, 402 S.W.3d 202, 211-12 (Tenn. 2013)). Additionally, accomplices cannot corroborate each other. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). This court has

defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). This means that the person must do more than have a guilty knowledge, be morally delinquent, or participate in other offenses with the principal actor. *State v. Jackson*, 52 S.W.3d 661, 666 (Tenn. Crim. App. 2001). The test for whether a witness qualifies as an accomplice is "whether the alleged accomplice could be indicted for the same offense charged against the defendant." *Allen*, 976 S.W.2d at 666.

Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, our supreme court has noted that the corroboration required can be slight. The court stated that in order to properly corroborate accomplice testimony:

> [t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. The corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's [testimony].

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). The sufficiency of the corroboration is a determination entrusted to the jury as the trier of fact. *Shaw*, 37 S.W.3d at 903.

In this case, the evidence was more than sufficient to corroborate Mr. Sandifer's testimony. Ms. Dozier and Mr. Sandifer both testified that Co-defendant Wallace approached the driver's side of the victim's car wearing a camouflage bandana over his face and that Defendant's face was not covered with anything when he approached the passenger's side. Both men simultaneously ran up to the car and pointed their weapons at the victim and Ms. Dozier. Ms. Dozier and Mr. Sandifer testified that there was one gunshot followed by a short pause before additional gunshots were fired. Mr. Sandifer and Ms. Dozier both testified that Defendant was wearing a white shirt underneath a multicolored cardigan, dark pants, and a white hat.

The surveillance videos from Wendy's and the Marathon store show that Defendant and Co-defendant Wallace were together at both places before the shooting and what they were wearing. The Wendy's video also showed Defendant and Co-

defendant Wallace turn the corner in front of the Samaritan Building before the shooting. Detective Davis testified that Mr. Sandifer's statements during his third interview were consistent with Ms. Dozier's account of the shooting. In our view, there was sufficient evidence from which the jury would conclude that Mr. Sandifer's testimony was sufficiently corroborated.

There was obviously overwhelming proof in this case of the felony murder of the victim. Ms. Dozier observed the perpetrator next to the passenger window who she identified at trial as Defendant, with a gun. Mr. Sandifer observed Defendant shoot his gun while standing at the passenger side of the car. The description of the clothing worn by the perpetrator at Ms. Dozier's window matched the clothing Defendant was wearing in the surveillance camera video and still pictures. The evidence, excluding Mr. Sandifer's testimony, clearly establishes the inference that Defendant was one of two persons involved in the attempted robbery of the victim, resulting in the death of the victim during the attempt by the two men to perpetrate the robbery. Defendant is not entitled to relief on this issue.

II.     *Whether the Trial Court Properly Excluded Testimony by Timothy Harlan*

Defendant contends that the trial court abused its discretion by excluding the testimony of Timothy Harlan, Co-defendant Wallace's cell-mate, concerning statements allegedly made by Co-defendant Wallace concerning the shooting.

At the close of the State's proof, Defendant sought to call Timothy Harlan as a witness. Defense counsel noted that Mr. Harlan was listed as one of the State's witnesses. Defense counsel also informed the trial court that "Mr. Harlan was in a cell with [Co-defendant] Wallace and talked to detectives and had some incriminating statements that he told the detectives that [Co-defendant] Wallace made to him." The following exchange then took place:

THE COURT:         He is here, correct?

[Prosecutor]:         He is here, but I think she's wanting to put him on for something that he won't be able to testify to.

THE COURT:         What do you want to ask him? And his attorney is?

[Prosecutor]:         Mr. Duke.

THE COURT:         He's been hanging around. He needs to be here.

- 19 -

| | |
|---|---|
| [Defense Counsel]: | What I would like to ask him is what [Co-defendant] Wallace told him. |
| [Prosecutor]: | And that's fine for what [Co-defendant] Wallace said he himself did, but I think she wants to get out what [Co-defendant] Wallace told Mr. Harlan the other people did. That would not be a statement against interest, and it would be hearsay and self-serving and all - - |
| [Defense Counsel]: | I think it would be a statement against [Co-defendant] Wallace's interest. |
| [Prosecutor]: | As to what he did but not as to what the people who were with him did. |
| [Defense Counsel]: | It would still be against his interest to say what the other people did. |
| [Prosecutor]: | I don't think that's what the cases say. In fact, I have a case - - |
| THE COURT: | He has not talked to [Defendant]. He only talked to [Co-defendant] Wallace. It's whatever [Co-defendant] Wallace told him about what happened, is that what - - I mean, I've seen the report, but I've kind of forgotten what exactly it is - - you're wanting about what [Co-defendant] Wallace said happened? |
| [Prosecutor]: | (Moves head up and down.) |
| [Defense Counsel]: | Yes. |
| THE COURT: | How is that not hearsay, self-serving hearsay? The only reason that [Co-defendant] Wallace's statement would come in was because it's - - I assume it's a statement against interest. |
| [Prosecutor]: | Correct. |

- 20 -

| | |
|---|---|
| [Co-defendant Counsel]: | Judge, that's not quite accurate because [Defendant] and Mr. Harlan were in the same pod over at CCA or at holding. |
| THE COURT: | Yeah, but was he going to testify to anything [Defendant] said? |
| [Prosecutor]: | No. Just what - - my understanding is he was going to testify as to what [Co-defendant] Wallace told him. |
| THE COURT: | Okay. But what I'm saying is has he ever talked to [Defendant]? Has he informed anybody that he has talked to [Defendant]? |
| [Prosecutor]: | I don't have any knowledge of that. |
| THE COURT: | So I don't even know what it would be. It's still hearsay unless it's incriminating. |
| [Defense Counsel]: | Right. |
| THE COURT: | To your client. |
| [Defense Counsel]: | Right. |
| THE COURT: | Which I assume you wouldn't' want in . . . |
| [Defense Counsel]: | I would be asking to have it admitted under - - I cannot call [Co-defendant] Wallace. He is an unavailable witness. And it's statement against [Co-defendant] Wallace's interest. |
| [Co-defendant Counsel]: | She is not prosecuting [Co-defendant] Wallace. |
| [Defense Counsel]: | Not a party opponent. |
| THE COURT: | But you would be limited to what [Co-defendant] Wallace said, not what he said about your client. |
| [Defense Counsel]: | Okay. |

- 21 -

THE COURT:          Wouldn't you. Because yours would be - - it's obviously not against Mr. Harlan's interest. He's not going to give a statement against Mr. Harlan's interest.

[Defense Counsel]:   No.

THE COURT:          So the only thing you're trying to do is put something in the record that [Co-defendant] Wallace told him about your client. And unless it's against your client's interest it doesn't come in because it's hearsay. It's self-serving otherwise. I don't know what he would say but . . .

[Prosecutor]:        He actually doesn't name her client. He just says [Co-defendant] Wallace told him what [Co-defendant] Wallace did, and the other boys ran. That's what she's trying to get in is the other boys ran. I don't think that's a statement against [Co-defendant] Wallace's interest.

THE COURT:          No. I mean, a statement against his interest he did it.

[Prosecutor]:        Right. That's the only thing that could come in. And I do have some cases on that.

THE COURT:          What is your theory of how it comes in?

[Defense Counsel:    Well, it's a statement against [Co-defendant] Wallace's interest. He's unavailable because I am - - he's - - under privilege I cannot call him.

THE COURT:          Right.

[Defense Counsel]:   And it is against [Co-defendant] Wallace's interest.

THE COURT:          Correct.

- 22 -

| | |
|---|---|
| [Defense Counsel]: | Yes. |
| THE COURT: | However what he said about your client isn't admissible. So you're trying to just put the statement in that [Co-defendant] Wallace says I did it? |
| [Defense Counsel]: | If I'm not allowed to ask questions about what [Defendant's] role is, then I would like to call him about [Co-defendant] Wallace's statements. |
| THE COURT: | Calling a co[-]defendant who is unavailable because they had a Fifth Amendment right not to testify, I don't think the law allows that. I mean, obviously he's a co[-]defendant. So you're wanting to get a co[-]defendant's statement to somebody else in as they're sitting here so that [Co-defendant's Counsel] can't cross-examine that either . |
| [Prosecutor]: | They're not party opponents. |
| THE COURT: | Yeah. |
| [Defense Counsel]: | Right. |
| THE COURT: | Have you got a case? |
| [Defense Counsel]: | No. |
| THE COURT: | Well, the answer to that is no. |

As pointed out by the State, Defendant failed to make an offer of proof regarding what Mr. Harlan's testimony would have been had the trial court allowed him to testify. Error may not be predicated upon a ruling excluding evidence unless "a substantial right of the party is affected" and "the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context." Tenn. R. Evid. 103(a)(2). An offer of proof is a means by which to ensure "effective and meaningful appellate review." *State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997). "[G]enerally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded." *Id.* The prosecutor in this case informed the trial

- 23 -

court the following as to what Mr. Harlan's testimony would be: "[Mr. Harlan] just says [Co-defendant] Wallace told him what [Co-defendant] Wallace did, and the other boys ran." The trial court mentioned that "a statement against his [Co-defendant Wallace] interest he did it." In context, that was a hypothetical example by the trial court and not an acknowledgement of the testimony.

Defense counsel never specifically stated what she believed would be Mr. Harlan's testimony. In fact, defense counsel did not respond to the trial court's direct questions about the content of the proposed testimony twice during the colloquy among the trial court, the State, and Defendant's counsel. One of the questions by the trial court to defense counsel was direct and to the point: "THE COURT: So you're trying to just put the statement in that [Co-defendant] Wallace says [']I did it[']?" Defense counsel's response to this direct question attempting to find out the precise testimony anticipated to be given by Mr. Harlan was: "[Defense Counsel]: If I'm allowed to ask questions about what [Defendant's] role is, then I would like to call [Mr. Harlan] about [Co-defendant] Wallace's statements." The other opportunity to proffer the proposed testimony was when the trial court asked defense counsel what she wanted to ask Mr. Harlan. Defendant's counsel said she wanted to ask Mr. Harlan what it was that Co-defendant Wallace told him but counsel failed to state what the answer would be.

There was nothing else presented concerning Mr. Harlan's potential testimony. It was noted that Mr. Harlan and his attorney were both present at trial, and Defendant could have called Mr. Harlan for an offer of proof concerning this matter but failed to do so. Defendant's failure to make an offer of proof precludes this court from making an effective and meaningful appellate review of the issue. Therefore, this issue is waived, and Defendant is not entitled to relief. Furthermore, on appeal Defendant argues that the testimony would be admissible as a statement of a party opponent pursuant to Tenn. R. Evid. 803 (1.2) and as a statement against interest pursuant to Tenn. R. Evid. 804 (b)(3). As to it being a statement of a party opponent, defense counsel took the position in the trial court that that rule did not apply. Thus, that theory is waived on appeal because a party is not permitted to assert one theory at trial and argue inconsistently with it on appeal. *See State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988); *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988).

*Whether the Trial Court Properly Instructed the Jury*

Defendant argues that the trial court erred in failing to instruct the jury on the lesser-included offenses of voluntary manslaughter, reckless homicide, criminally negligent homicide, facilitation of voluntary manslaughter, facilitation of reckless homicide, and facilitation of criminally negligent homicide. The State responds that Defendant waived this issue by failing to make a written request for the instructions and that he is not entitled to plain error review. The State further argues that Defendant

- 24 -

conceded at trial that an instruction on voluntary manslaughter was not supported by the proof.

Upon written request by either party, "the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser[-]included offense of the offense charged in the indictment[.]" T.C.A. § 40-18-110(a). In determining whether an offense is a lesser-included offense of the charged crime, the trial court should consider the evidence "in the light most favorable to the existence of the lesser-included offense." *State v. Ely*, 48 S.W.3d 710, 722 (Tenn. 2001). When a defendant is charged with a felony through criminal responsibility for the actions of another, facilitation of the felony is a lesser-included offense. *State v. Fowler*, 23 S.W.3d 285, 288 (Tenn. 2000). In the absence of a written request, a trial court may instruct a jury on lesser-included offenses, but a defendant is not entitled to such an instruction, and the failure of the trial court to give such an instruction is waived as an issue on appeal. T.C.A. § 40-18-110(b), (c). However, the issue may be reviewed for plain error. *State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006).

In this case, the trial court instructed the jury on the offenses of facilitation of first-degree felony murder, second-degree murder, and facilitation of second-degree murder as lesser-included offenses of first-degree felony murder. The record reflects that Defendant made a written request for the lesser-included offense of voluntary manslaughter. During trial, at the charge conference, Defendant renewed his request for an instruction of voluntary manslaughter as a lesser-included offense of first degree felony murder. The trial court asked Defendant for proof from the record to support such an instruction, and the following exchange took place:

| THE COURT: | Okay. Can you tell me what evidence is in the record that would allow a jury to find that charge? |
|---|---|
| [Defense Counsel]: | I cannot. |
| THE COURT: | Okay. That's what I was thinking. There was absolutely nothing. I'm only required to charge what there is sufficient evidence, what a rational juror could find. And clearly, even with your request, it says that whether an instruction is required depends on the evidence not the theory of the defense or the State's case. So I find absolutely no evidence in this record. As a matter of fact, the victim was shot in the back of the head as two people came up from the back as he was sitting in his |

- 25 -

car. And as he attempted to drive off, he got shot. There is no provocation, there's no passion, there's nothing. So I'm denying your request.

This court has held that voluntary manslaughter is a lesser-included offense of felony murder. *State v. Edward Joseph Benesch II*, No. M2015-02124-CCA-R3-CD, 2017 WL 3670196, at *16 (Tenn. Crim. App. Aug. 25, 2017). We agree with the trial court that the evidence presented at trial did not support an instruction on voluntary manslaughter. Voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). There is absolutely nothing in the proof presented at trial to show that Defendant acted in an "irrational manner in a state of passion produced by adequate provocation" as argued by Defendant. Defendant and Co-defendant Wallace approached the victim's car with guns as the unarmed victim and Ms. Dozier were sitting in the car talking and shot the victim in the back of the head. There was no evidence that the victim did anything whatsoever to provoke Defendant at the time of the shooting. Therefore, the trial court did not err by denying Defendant's request for a jury instruction on voluntary manslaughter.

Defendant did not submit a written request to the trial court for instructions on reckless homicide, criminally negligent homicide, facilitation of voluntary manslaughter, facilitation of reckless homicide, and facilitation of criminally negligent homicide; therefore, he has waived plenary review of the issue. Additionally, Defendant has failed to establish that he is entitled to plain error relief. We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

As noted above, the record shows that the trial court instructed the jury on facilitation of first-degree felony murder, second degree murder, and facilitation of second degree murder as lesser-included offenses of first-degree felony murder. Reckless homicide, criminally negligent homicide, facilitation of voluntary manslaughter,

- 26 -

facilitation of reckless homicide, and facilitation of criminally negligent homicide are lesser-included offenses of felony murder. *Ely*, 48 S.W.3d at 721-22; *Edward Joseph Benesch II*, 2017 WL 3670196, at \*16. However, the trial court's failure to instruct the jury on those offenses does not rise to the level of plain error because consideration of the issue is not necessary to do substantial justice. Since we have already determined that there was not sufficient evidence for an instruction on voluntary manslaughter, there is likewise not sufficient evidence for a jury instruction on facilitation of voluntary manslaughter. Moreover, the Tennessee Supreme Court has indicated that when a jury receives a sequential instruction as well as an instruction on immediate lesser-included offenses, as was the case here, the omission of additional lesser-included offenses is harmless error. *See State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998) (noting that "by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses"). Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE